# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# FORT LAUDERDALE DIVISION

STATE OF FLORIDA,

   *Plaintiff*,

   v.

PETE BUTTIGIEG, in his official capacity as Secretary of the Department of Transportation; the DEPARTMENT OF TRANSPORTATION; JULIE A. SU, in her official capacity as Acting Secretary of the Department of Labor; the DEPARTMENT OF LABOR; KAREN TORRE, in her official capacity as Chief of the Division of Interpretation and Regulations at the Department of Transportation; NURIA FERNANDEZ, in her official capacity as Administrator of the Federal Transit Administration; YVETTE G. TAYLOR, in her official capacity as Regional Administrator of the Federal Transit Administration; the FEDERAL TRANSIT ADMINISTRATION; the UNITED STATES OF AMERICA,

   *Defendants*.

_____/

Case No. 0:23-cv-61890

## COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DECLARATORY RELIEF

1. Public sector employees have a constitutional right to decide whether to participate in a union. The Biden Administration, however, seeks to elevate the

political and financial interests of Florida's public sector unions over the rights of working class Floridians to make that decision for themselves.

2. "Congress must speak 'unambiguously' and 'with a clear voice' when it imposes conditions on federal funds." *West Virginia v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1141 (11th Cir. 2023) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). A funding condition that fails to satisfy that requirement is unconstitutional. *See id.* at 1146.

3. Yet the Biden Administration is attempting to leverage a vague and general condition on federal funding to prevent Florida from reforming its collective bargaining process.

4. Specifically, as a condition of receiving hundreds of millions of dollars in transportation infrastructure funding, Florida must agree to "arrangements the Secretary of Labor concludes are fair and equitable" to protect "the interests of employees affected by the assistance." 49 U.S.C. § 5333(b)(1). While the statute does not define what is "fair and equitable," it does state that these arrangements must include certain provisions. *See* 49 U.S.C. § 5333(b)(2)(A)–(F).

5. At issue here is the requirement that Florida agree to "provisions that may be necessary for . . . the continuation of collective bargaining rights." 49 U.S.C. § 5333(b)(2)(B).

6. To be clear, Florida has no intention of abolishing the collective bargaining rights of transportation workers. *See* Art. I, § 6, Fla. Const. (protecting

"[t]he right of employees, by and through a labor organization, to bargain collectively").

7. But the Biden Administration reads the phrase "continuation of collective bargaining rights" in § 5333(b) to mean that Florida cannot enact reasonable regulations governing the collective bargaining process, such as those the Legislature enacted earlier this year in Senate Bill 256 (SB 256).

8. The Department of Labor's application of § 5333(b) to the State of Florida is flagrantly unconstitutional. As at least one court has recognized, "it is unclear" under what circumstances "Congress intended for the Secretary of Labor to deny funding applications." *Amalgamated Transit Union, Int'l v. U.S. Dep't of Labor*, No. 2:20-cv-953, 2022 WL 17978627, at *38 (E.D. Ca. Dec. 28, 2022). In fact, that court noted that the statute might even be "*intentionally* vague." *Id.* (emphasis added).

9. Moreover, even if this Court finds § 5333(b) constitutional, "the Spending Clause's required clear-statement rule" would compel the Court to reject the Department of Labor's position. *See Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 815–16 (11th Cir. 2022) (en banc).

10. The Department of Labor has given Florida an ultimatum—abandon the reforms enacted through SB 256 or lose hundreds of millions in federal funding.

11. Because that ultimatum is based on an unconstitutional funding condition and is otherwise contrary to law, Florida brings this suit to protect its access to critical funding and its sovereign prerogative to regulate in the realm of collective bargaining.

3

## PARTIES

12. Plaintiff the State of Florida is a sovereign State and has the authority and responsibility to protect its public fisc and the health, safety, and welfare of its citizens. As the State's Chief Legal Officer, the Attorney General is authorized to represent the interests of the State in civil suits. § 16.01(4), (5), Fla. Stat.

13. Defendants are the United States of America, the Department of Transportation, its component the Federal Transit Administration, the Department of Labor, and the relevant officials within those agencies. Defendants are responsible for implementing the grant programs at issue in this case.

14. Florida sues the United States under 5 U.S.C. §§ 702–03 and 28 U.S.C. § 1346.

15. Florida sues the Departments of Transportation, the Federal Transit Administration, and the Department of Labor under 5 U.S.C. §§ 702–03.

16. Defendant Pete Buttigieg is the Secretary of Transportation.

17. Defendant Nuria Fernandez is the Administrator of the Federal Transit Administration.

18. Defendant Yvette G. Taylor is the Regional Administrator for the Federal Transit Administration responsible for Region 4, which includes Florida.

19. Defendant Julie A. Su is the Acting Secretary of Labor.

20. Defendant Karen Torre is the Chief of the Division of Interpretation and Regulations at the Department of Labor and is the official who seeks to impose the challenged requirements on Florida.

21. Florida sues Defendants Buttigieg, Fernandez, Taylor, Su, and Torre in their official capacities under 5 U.S.C. §§ 702–06, 28 U.S.C. § 1361, the U.S. Constitution, and equitable principles.

## JURISDICTION AND VENUE

22. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, 1361, and 2201–02, 5 U.S.C. §§ 702–06, the U.S. Constitution, and the Court's equitable powers.

23. Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1) because Plaintiff the State of Florida is a resident of every judicial district in its sovereign territory, including this district (and division). *See California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018); *Florida v. United States*, No. 3:21-cv-1066, 2022 WL 2431443, at *2 (N.D. Fla. Jan. 18, 2022).[1] Moreover, because the relevant grant programs provide substantial funding to Broward County, a substantial part of the events or omissions giving rise to this case occurred here.

## BACKGROUND

### The Federal Transit Act

24. In 1964, Congress enacted the Urban Mass Transportation Act (UMTA) "to foster the development and revitalization of public transportation systems with the cooperation of both public transportation companies and private companies engaged

---

[1] *Accord Alabama v. U.S. Army Corps of Eng'rs*, 382 F. Supp. 2d 1301, 1329 (N.D. Ala. 2005); *see also Atlanta & F.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1892) (explaining that "the state government . . . resides at every point within the boundaries of the state").

in public transportation." 49 U.S.C. § 5301(a). In 1991, Congress renamed the UMTA the Federal Transit Act.

25. Pursuant to the Federal Transit Act, the State of Florida receives federal funding for its transit systems. This funding can be used, for example, to make critical improvements and repairs to public rail and bus systems.

26. In Florida, Federal Transit Act funding goes to regional transit authorities like the Central Florida Regional Transportation Authority and political subdivisions like Broward County.

27. According to the Florida Public Transportation Association, Florida entities expect to receive close to $800 million in Federal Transit Act funding in the coming years. *See* Ex. 1 at 2.

28. Since 1964, this funding has been subject to certain conditions. Although the Federal Transit Administration makes the awards, the Department of Labor administers the conditions relevant here.

29. Specifically, "[a]s a condition of financial assistance," grantees must agree to "arrangements the Secretary of Labor concludes are fair and equitable" to protect "interests of the employees" affected by the grants. 49 U.S.C. § 5333(b)(1).

30. Congress included the provisions in § 5333(b) because "[t]he Act was designed in part to provide federal aid for local governments in acquiring failing private transit companies," and "Congress was aware that public ownership might threaten existing collective-bargaining rights of unionized transit workers" because some States

"forbade collective bargaining by state and local government employees." *Jackson Transit Auth. v. Amalgamated Transit Union*, 457 U.S. 15, 17 (1982).

31.    Consistent with that purpose, the "fair and equitable . . . arrangements" approved by the Secretary of Labor "shall include provisions" addressing six specific topics. 49 U.S.C. § 5333(b).

32.    The topic at issue in this case is addressed in § 5333(b)(2)(B). It states that grant agreements "shall include provisions that may be necessary for . . . the continuation of collective bargaining rights." 49 U.S.C. § 5333(b)(2)(B).

33.    Notably, that language—which is prospective in nature—is narrower than the language governing rights under *existing* collective bargaining agreements. For existing agreements, the statute requires "provisions that may be necessary for . . . the preservation of rights, privileges, and benefits." 49 U.S.C. § 5333(b)(2)(A).

34.    In other words, the statute requires States to "continu[e] . . . collective bargaining rights" for affected transit workers on an ongoing basis, and it requires States to "preserv[e] . . . rights, privileges, and benefits" reflected in collective bargaining agreements already in effect. *See* 49 U.S.C. § 5333(b)(2)(A)–(B).

**Senate Bill 256**

35.    Article I, Section 6 of the Florida Constitution—first adopted in 1944— provides that "[t]he right of persons to work shall not be denied or abridged on account of membership or non-membership in any labor union or labor organization."

36.    Section 6 further provides that "[t]he right of employees, by and through a labor organization, to bargain collectively shall not be denied or abridged."

7

37. Together these provisions grant a state constitutional right to collective bargaining, but they also grant a right to work without joining a union. *See also Janus v. AFSCME*, 138 S. Ct. 2448, 2459–60 (2018) (explaining that "forc[ing]" nonmembers to "subsidize a union . . . violates the free speech rights of nonmembers").

38. Chapter 447, Florida Statutes, regulates unions and the collective bargaining process in Florida.

39. For public sector unions—that is, unions representing employees of state and local entities—the Public Employees Relations Commission (PERC) is responsible for resolving disputes between employees, employers, and unions. *See* §§ 447.201(3), 447.207, Fla. Stat.

40. PERC is also responsible for certifying unions. An "employee organization" must "become a certified bargaining agent" by registering with PERC to obtain the right to act as the "exclusive bargaining agent" for a class of employees. § 447.305, Fla. Stat.

41. On May 9, 2023, Governor DeSantis signed SB 256.

42. SB 256 made certain reforms to collective bargaining in Florida. Relevant here are three such reforms.

43. First, public employees who wish to be represented by a union must sign a "membership authorization form," which discloses to the employee that he "has the right to join and pay dues to a labor union or to refrain from joining and paying dues to a labor union." § 447.301(1)(b), Fla. Stat.

44. Second, SB 256 eliminates the status of government employers as bill collectors and middlemen between public employees and their unions. "[A]n employee organization that has been certified as a bargaining agent may not have its dues and uniform assessments deducted and collected by the employer from the salaries of those employees"—instead, "[a] public employee may pay dues . . . directly to the employee organization." § 447.303(1), Fla. Stat.[2]

45. Third, SB 256 reforms how PERC determines if a union is eligible to serve as the exclusive bargaining agent for a class of employees. Specifically, when public sector unions seek their annual certification renewal from PERC, § 447.305(2), Fla. Stat., they must demonstrate that at least 60% of employees eligible for participation in the union have elected to participate by paying their dues, § 447.305(6), Fla. Stat.

46. These reforms are designed to ensure that public employees in Florida make a conscious and deliberate decision regarding their constitutional right to participate or not participate in a union.

47. They are also designed to ensure that public sector unions granted the significant power to act as the "exclusive bargaining agent" for a class of public employees have the support of a critical threshold (60%) of those employees.

48. In enacting SB 256, the Florida Legislature anticipated that the Department of Labor might seek to deny the State of Florida federal funding. It

---

[2] Certain industries are not covered by this provision, *see* § 447.303(2)(a), Fla. Stat., but those unions are not relevant to this case.

therefore granted PERC the authority to "waive" these new provisions, but only "to the extent necessary for the public employer to comply with the requirements of 49 U.S.C. § 5333(b)." *See* § 447.207(12), Fla. Stat.

**The Department of Labor's Actions Since Governor DeSantis Signed SB 256**

49.   A few days before SB 256's reforms went into effect on July 1, 2023, the Department of Labor began notifying Florida entities of its determination that SB 256 "jeopardizes [their] continued eligibility to receive Federal Transit Administration Funding" in light of § 5333(b). *See, e.g.*, Ex. 2 at 4.[3]

50.   In response, the affected political subdivisions sought a waiver from PERC under § 447.207(12).

51.   Initially, PERC granted time limited waivers, which expire "the date upon which the current [collective bargaining agreement] expires." Ex. 2. at 5. PERC did so in light of § 5333(b)(2)(A), which addresses the "preservation of rights, privileges, and benefits . . . under *existing collective bargaining agreements*." 49 U.S.C. § 5333(b)(2)(A) (emphasis added); *see* Ex. 2 at 3–5.

52.   For purposes of this case, the State of Florida does not dispute the Department of Labor's position with respect to subsection (A) and the need to "preserv[e] . . . rights, privileges, and benefits . . . under existing collective bargaining agreements." 49 U.S.C. § 5333(b)(2)(A).

---

[3] Florida cites Exhibit 2, which addresses Broward County, as an example. Affected entities were dealt with by both the Department of Labor and PERC in a materially similar manner.

53. The issues relevant to this case arose, however, when the Department of Labor notified Florida entities that the waivers were insufficient in light of subsection (B).

54. Specifically, in response to PERC's initial orders granting waivers, the Department of Labor notified Florida entities of its determination that SB 256 results in the "[dis]continuation of collective bargaining rights" in Florida, contrary to § 5333(b)(2)(B)'s requirements. *See, e.g.*, Ex. 3 at 4–6.[4] The Department of Labor further notified these entities that a "[w]aiver that [e]xtends for the [l]ife of the [f]ederally [f]unded [p]roject is [n]eeded." Ex. 3 at 5.

55. Affected entities again sought waivers from PERC. This time, however, PERC granted these Florida entities only a *conditional* waiver. *See, e.g.*, Ex. 4.[5]

56. In its order granting this relief, PERC "question[ed]" the Department of Labor's "interpretation of . . . 49 U.S.C. § 5333(b)," Ex. 4 at 12, but it granted waivers subject to the caveat that "[t]he waiver shall immediately expire upon any final decision of [the Department of Labor] or a court of competent jurisdiction declaring the above-stated provisions do not violate the protections imposed by 49 U.S.C. § 5333(b)," Ex. 4 at 13.[6]

---

[4] As with Exhibit 2, Exhibit 3 is a representative example.

[5] As with Exhibits 2 and 3, Exhibit 4 is a representative example.

[6] Because PERC separately granted waivers for the duration of current collective bargaining agreements, the second round of waivers go into effect when the first round of waivers expire.

57. PERC handled the matter this way because "time [was] of the essence," Ex. 4 at 12, and Defendants demanded that "all grant applications . . . have all final . . . signatures by September 25." Ex. 4 at 4.

58. In other words, rather than allow the State to lose hundreds of millions in federal funds, PERC granted the conditional waivers and expressly preserved "the right of the State of Florida, on behalf of its . . . grantees, to challenge the [Department of Labor's] determination." Ex. 4 at 13 n.6.

59. The State of Florida now files this suit to prevent the irreparable harm caused by the Department of Labor's actions. *See Florida v. Nelson*, 576 F. Supp. 3d 1017, 1039 (M.D. Fla. 2021) (explaining that "a state's 'inability to enforce [its] duly enacted plans clearly inflicts irreparable harm on the State'" (quoting *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018))); *Florida v. Becerra*, 544 F. Supp. 3d 1241, 1300 (M.D. Fla. 2021) (explaining that when "sovereign immunity bars the recovery of monetary damages from the federal government," the State's "financial injury . . . becomes irreparable").

## CLAIMS

### COUNT 1

### Violation of the Spending Clause

### (Individual Defendants Only)

60. Florida repeats and incorporates by reference ¶¶ 1–13, 16–59.

61. The Spending Clause authorizes Congress to "lay and collect Taxes, . . . to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1.

62. "[T]o pass constitutional muster," Spending Clause conditions applied to the States must satisfy several requirements. At issue here is the requirement that "any attached condition . . . be 'unambiguous[].'" *West Virginia*, 59 F.4th at 1141 (quoting *South Dakota v. Dole*, 483 U.S. 203, 207–11 (1987)).

63. Section 5333(b) violates that requirement. It purports to grant the Secretary of Labor broad authority to decide what arrangements are "fair and equitable" to protect "the interests of employees affected by" Federal Transit Act funding. 49 U.S.C. § 5333(b).

64. In fact, some courts have viewed this provision as so nebulous that they have treated the Secretary's decision to grant or deny funding as unreviewable under the Administrative Procedure Act (APA). *See City of Macon v. Marshall*, 439 F. Supp. 1209, 1220 (M.D. Ga. 1977) (explaining that the statute "leave[s] the Secretary to determine in his judgment what is fair and equitable").

65. The Eleventh Circuit has recognized, however, that the Constitution requires "an ascertainable condition" to exist "in the statute" itself. *West Virginia*, 59 F.4th at 1148. In other words, "[t]he Constitution does not allow the Secretary to [supply missing] content," *id.*, because "[t]he Constitution gives Congress, not the executive branch, the power to tax and spend," *id.* at 1147.

66. Moreover, the specific phrase at issue here, which requires "provisions that may be necessary for . . . the continuation of collective bargaining rights," 49 U.S.C. § 5333(b)(2)(B), is similarly ambiguous.

67. Courts have expressly reached that conclusion. For example, one federal court has found that "it is unclear" under what circumstances "Congress intended for the Secretary of Labor to deny funding applications." *Amalgamated Transit Union, Int'l*, 2022 WL 17978627, at *38. The court even questioned whether the statute might be "*intentionally* vague." *Id.* (emphasis added).

68. Similarly, the Supreme Court of New Jersey has recognized that "there is virtually no guidance from the case law, legislative history, or documented action by the Department of Labor" to determine when "conflicts between state law and section [5333(b)] will result in . . . defunding of a state transit system." *See Matter of New Jersey Transit Bus Operations, Inc.*, 592 A.2d 547, 559 (N.J. 1991). The court further noted that "we know very little . . . what the UMTA condition mean[s]." *Id.*

69. None of these courts, however, have considered the implications of the Spending Clause's requirement that funding conditions be unambiguous.

70. In this case, Eleventh Circuit law requires finding § 5333(b) unconstitutional.

## COUNT 2

## Violation of the Administrative Procedure Act

### (All Defendants)

71. Florida repeats and incorporates by reference ¶¶ 1–59.

72. Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, . . . or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C). A court must also "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

73. The Department of Labor's determination that § 5553(b)(2)(B) requires Florida to waive certain provisions of SB 256 is contrary to law and arbitrary and capricious. *See* Ex. 3.

74. As explained, § 5333(b) is ambiguous. But if the Court finds it unambiguous enough to be constitutional, it must adopt a narrow interpretation of the phrase "continuation of collective bargaining rights" because of "the Spending Clause's required clear-statement rule." *See Adams*, 57 F.4th at 815–16.

75. If Congress intended to prevent Florida from incrementally reforming the collecting bargaining process in Florida, it was required to use language more clear than general language regarding "the continuation of collective bargaining rights."

76.     To be sure, some courts have interpreted § 5333(b) without addressing the Spending Clause's clear statement rule. *E.g.*, *Amalgamated Transit Union Int'l v. Donovan*, 767 F.2d 939 (D.C. Cir. 1985). But it appears that no party raised the issue in those cases.

77.     Moreover, even without applying the clear statement rule, the D.C. Circuit recognized in *Donovan* that "Congress [did not] impose[] upon the states the precise definition of 'collective bargaining' established by the" National Labor Relations Act, which applies to private employers. *Id.* at 949.

78.     Other courts applying *Donovan* have recognized a distinction between states laws that prevent "collective bargaining on . . . subjects previously subject to bargaining" and state laws that "change[] the parameters within which collective bargaining may proceed." *California v. U.S. Dep't of Labor*, No. 2:13-cv-02069, 2016 WL 4441221, at *4 (E.D. Cal. Aug. 22, 2016).

79.     Notably, the Department of Labor has not cited a single case holding that reforms like those in SB 256 violate § 5333(b). Ex. 3 at 5. And the Department of Labor's interpretation is not entitled to *Chevron* deference, among other reasons, because the Court must apply the clear statement rule *before* deciding whether § 5333(b) is ambiguous. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984) (explaining that courts "employ[] traditional rules of statutory construction" before finding an ambiguity and awarding deference).

80.     Finally, the Department of Labor's decision is arbitrary and capricious. The agency's reasoning is sparse at best, the agency failed to meaningfully consider

the implications of the Spending Clause or the significant effect on the constitutional right to work as a result of its actions, and the timing of the agency's decision appears designed to frustrate judicial review.

## PRAYER FOR RELIEF

For these reasons, Florida asks the Court to:

a) Preliminarily and permanently enjoin Defendants from withholding grants from Florida entities based on 49 U.S.C. § 5333(b).

b) Declare unconstitutional, facially and as applied to Florida, the requirements in 49 U.S.C. § 5333(b).

c) In the alternative, if the Court denies (b), hold unlawful and set aside, pursuant to the APA, the Department of Labor's written decisions determining that Florida must waive provisions of SB 256 in order to be eligible for funding.

d) In the alternative, if the Court denies (b), declare that Florida law complies with § 5333(b).

e) Award Florida costs and reasonable attorney's fees.

f) Award such other relief as the Court deems equitable and just.

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

*/s/ James H. Percival*
James H. Percival (FBN 1016188)
CHIEF OF STAFF

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

NATALIE P. CHRISTMAS (FBN 1019180)
COUNSELOR TO THE ATTORNEY GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*