UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

Case No. 23-61890-CIV-SMITH

STATE OF FLORIDA,

    *Plaintiff*,

    v.

PETE BUTTIGIEG, *et al.*,

    *Defendants*.

_____/

## FLORIDA'S MOTION FOR PRELIMINARY INJUNCTION

Through Senate Bill 256 (SB 256), Florida's elected representatives made several reasonable reforms to the collective bargaining process. In response, the Department of Labor gave the State a choice—waive the requirements of that law or lose nearly $800 million in federal funding.

The Department's ultimatum is unlawful. If Congress wishes to impose conditions on funding to the States, the conditions must be "ascertainable" and provide "clear notice" of their requirements. *West Virginia v. Dep't of Treasury*, 59 F.4th 1124, 1146 (11th Cir. 2023) (quotations omitted). Funding conditions that fail to do so are unconstitutional. *Id.*

The conditions at issue here authorize the Secretary of Labor to prescribe "arrangements" that are "fair and equitable" for "the continuation of collective bargaining rights." 49 U.S.C. § 5333(b)(1)–(2). Several courts have found these

conditions to be ambiguous. *E.g.*, *Amalgamated Transit Union, Int'l v. Dep't of Labor*, No. 2:20-cv-953, 2022 WL 17978627, at *38 (E.D. Cal. Dec. 28, 2022); *Matter of New Jersey Transit Bus Operations, Inc.*, 592 A.2d 547, 557–59 (N.J. 1991).

Because the conditions are ambiguous, they are unconstitutional under Eleventh Circuit precedent. Moreover, to the extent the Department of Labor advances a limiting construction to save the statute, it can do so only by adopting a narrower reading of § 5333(b)(2) and abandoning its position that SB 256 has the effect of discontinuing collective bargaining rights. Either way, Florida is entitled to receive its funding without waiving the requirements of SB 256.

So far, Florida's Public Employees Relations Commission (PERC) has exercised its statutory authority to conditionally waive the relevant provisions of SB 256 and avoid a devastating loss of funding to the State. But Florida suffers irreparable sovereign injury every day that its duly enacted laws are not in effect. And if PERC instead declined to grant waivers, the harm from losing nearly $800 million in federal funding would similarly be irreparable. This Court should grant a preliminary injunction.[1]

---

[1] This case presents purely legal issues. Florida therefore respectfully requests that the Court consolidate the preliminary injunction hearing with a final hearing on the merits under Rule 65(a)(2). Doing so would streamline this case and preserve the resources of both the Court and the parties.

## BACKGROUND

### I.   The Federal Transit Act.

In 1964, Congress enacted the Urban Mass Transportation Act (UMTA) "to foster the development and revitalization of public transportation systems with the cooperation of both public transportation companies and private companies engaged in public transportation." 49 U.S.C. § 5301(a). In 1991, Congress renamed the UMTA the Federal Transit Act. Pursuant to the Federal Transit Act, the State of Florida receives federal funding for its transit systems. This funding may be used "to acquire, improve, or operate mass transit systems." Ex. 1 at 2.

Federal Transit Act funding in Florida goes to regional transportation authorities like the Central Florida Regional Transportation Authority and political subdivisions like Broward County. Ex. 1 at 4–5. Over the coming years, Florida entities expect to receive between $700 and $800 million in federal funds. *See* Ex. 1 at 3–5; Doc. 1-1 at 2.

Since Congress enacted the UMTA in 1964, this funding has been subject to certain conditions. Although the Federal Transit Administration makes the awards, the Department of Labor administers the conditions relevant here.

Specifically, "[a]s a condition of financial assistance," grantees must agree to "arrangements the Secretary of Labor concludes are fair and equitable" to protect "interests of the employees" affected by the grants. 49 U.S.C. § 5333(b)(1). Congress included the provisions in § 5333(b) because "[t]he Act was designed in part to provide federal aid for local governments in acquiring failing private transit companies," and

"Congress was aware that public ownership might threaten existing collective-bargaining rights of unionized transit workers" because some States "forbade collective bargaining by state and local government employees." *Jackson Transit Auth. v. Amalgamated Transit Union*, 457 U.S. 15, 17 (1982).

Consistent with that purpose, the "fair and equitable . . . arrangements" approved by the Secretary of Labor "shall include provisions" addressing six specific topics. 49 U.S.C. § 5333(b). The topic at issue in this case is addressed in § 5333(b)(2)(B). It states that grant agreements "shall include provisions that may be necessary for . . . the continuation of collective bargaining rights." 49 U.S.C. § 5333(b)(2)(B). Notably, that language—which is prospective in nature—is narrower than the language governing rights under *existing* collective bargaining agreements. For existing agreements, the statute broadly requires "provisions that may be necessary for . . . the preservation of rights, privileges, and benefits." 49 U.S.C. § 5333(b)(2)(A). In other words, the statute requires States to "continu[e] . . . collective bargaining rights" for affected transit workers on an ongoing basis, and it requires States to "preserv[e] . . . rights, privileges, and benefits" reflected in collective bargaining agreements already in effect. *See* 49 U.S.C. § 5333(b)(2)(A)–(B).

## II.    Senate Bill 256.

Article I, Section 6 of the Florida Constitution—first adopted in 1944—provides that "[t]he right of persons to work shall not be denied or abridged on account of membership or non-membership in any labor union or labor organization." Section 6 further provides that "[t]he right of employees, by and through a labor organization,

4

to bargain collectively shall not be denied or abridged." Together these provisions grant a state constitutional right to collective bargaining, but they also grant a right to work without joining a union. *See also Janus v. AFSCME*, 138 S. Ct. 2448, 2459–60 (2018) (explaining that "forc[ing]" nonmembers to "subsidize a union . . . violates the free speech rights of nonmembers").

Chapter 447, Florida Statutes, regulates unions and the collective bargaining process in Florida. For public sector unions—that is, unions representing employees of state and local entities—PERC is responsible for resolving disputes between employees, employers, and unions. *See* §§ 447.201(3), 447.207, Fla. Stat. PERC is also responsible for certifying unions. An "employee organization" may "become a certified bargaining agent" only by registering with PERC to obtain the right to act as the "exclusive bargaining agent" for a class of employees. § 447.305, Fla. Stat.

On May 9, 2023, Governor DeSantis signed SB 256. SB 256 made certain reforms to collective bargaining in Florida. Relevant here are three such reforms.

First, public employees who wish to be represented by a union must sign a "membership authorization form," which discloses to the employee that he "has the right to join and pay dues to a labor union or to refrain from joining and paying dues to a labor union." § 447.301(1)(b), Fla. Stat.

Second, SB 256 eliminates the status of government employers as bill collectors and middlemen between public employees and their unions. "[A]n employee organization that has been certified as a bargaining agent may not have its dues and uniform assessments deducted and collected by the employer from the salaries of those

employees"—instead, "[a] public employee may pay dues . . . directly to the employee organization." § 447.303(1), Fla. Stat.

Third, SB 256 reforms how PERC determines if a union is eligible to serve as the exclusive bargaining agent for a class of employees. Specifically, when public sector unions seek their annual registration renewal from PERC, § 447.305(2), Fla. Stat., they must demonstrate that at least 60% of employees eligible for participation in the union have elected to participate by paying their dues, § 447.305(6), Fla. Stat. If a union cannot make this showing, it must seek recertification as the exclusive bargaining agent for the relevant class of employees. § 447.305(6), Fla. Stat. (discussing § 447.307, Fla. Stat.).

These reforms are designed to ensure that public employees in Florida make a conscious and deliberate decision regarding their constitutional right to participate or not participate in a union. They are also designed to ensure that public sector unions granted the significant power to act as the "exclusive bargaining agent" for a class of public employees have the support of a critical threshold (60%) of those employees.

In enacting SB 256, the Florida Legislature anticipated that the Department of Labor might seek to deny the State of Florida federal funding. It therefore granted PERC the authority to "waive" these new provisions (other than the membership authorization form requirement), but only "to the extent *necessary* for the public employer to comply with the requirements of 49 U.S.C. § 5333(b)." *See* § 447.207(12), Fla. Stat. (emphasis added).

### III.   The Biden Administration's Actions Since Governor DeSantis Signed SB 256.

Shortly before SB 256's reforms went into effect on July 1, 2023, the Department of Labor began notifying Florida entities of its determination that SB 256 "jeopardize[s] [their] continued eligibility to receive Federal Transit Administration Funding." Ex. 1 at 3, 11; Doc. 1-2 at 4. In response, affected Florida entities filed "emergency petition[s]" with PERC seeking a waiver under § 447.207(12) of the provisions of SB 256 discussed above. *See* Ex. 1 at 2–3, 7–8, 16; Doc. 1-2 at 2.

In late June and early July, PERC granted the requested waivers to affected Florida entities. *See* Ex. 1 at 3, 16–20; Doc. 1-2. It did so in light of § 5333(b)(2)(A), which requires "provisions that may be necessary for . . . the preservation of rights, privileges, and benefits . . . under existing collective bargaining agreements." *See* 49 U.S.C. § 5333(b)(2)(A); Ex. 1 at 3, 17; Doc. 1-2 at 3. And because the purpose of the waivers was to preserve rights under *existing* agreements, PERC only granted the waivers until the applicable collective bargaining agreements expire. *See* Ex. 1 at 3, 19; Doc. 1-2 at 5.

For purposes of this suit, Florida does not contest that these waivers were necessary to comply with § 5333(b)(2)(A). What prompted this suit was the Department of Labor's subsequent demand, a few weeks after PERC granted the time limited waivers, that PERC waive the three provisions of SB 256 for the *life of the federally funded projects*. The stated basis for this demand was the Department of Labor's

position that SB 256 results in the "[dis]continuat[ion] of collective bargaining rights" under § 5333(b)(2)(B). Ex. 1 at 3, 27–34; Doc. 1-3 at 4–6.

In response to that demand, affected political entities filed with PERC a second round of petitions for waiver. Ex. 1 at 3, 36. In late August and early September, PERC granted these waivers too. Ex. 1 at 5, 38–59; Doc. 1-4. This time, however, PERC granted only *conditional* waivers.

Specifically, PERC "question[ed]" the Department of Labor's position, Ex. 1 at 5, 48, 57; Doc. 1-4 at 12, but it "recognized the financial hardship facing the public employers and their public employees," Ex. 1 at 5, 48, 57; Doc. 1-4 at 12. PERC lacked authority to file suit against the Department of Labor on behalf of the State of Florida because that power belongs to the Attorney General. *See* § 16.01(4), (5), Fla. Stat. As such, PERC clarified in its orders that "[t]he waiver shall immediately expire upon any final decision of [the Department of Labor] or a court of competent jurisdiction declaring the above-stated provisions do not violate the protections imposed by 49 U.S.C. § 5333(b)." Ex. 1 at 5, 48, 58; Doc. 1-4 at 13. PERC also expressly noted its desire to preserve "the right of the State of Florida, on behalf of its . . . grantees, to challenge the [Department of Labor's] determination." Ex. 1 at 49 n.6, 58 n.3; Doc. 1-4 at 13 n.6.

The Attorney General filed suit on behalf of the State of Florida on October 4, 2023, and now seeks a preliminary injunction to prevent the irreparable harm caused by the State's inability to enforce its duly enacted laws. *See Florida v. Nelson*, 576 F. Supp. 3d 1017, 1039 (M.D. Fla. 2021) (explaining that "a state's 'inability to enforce

[its] duly enacted plans clearly inflicts irreparable harm on the State'" (quoting *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018))).

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction must establish (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Florida has established each of these requirements.

## ARGUMENT

**I.   Florida Is Likely to Succeed on the Merits.**

Florida challenges the Department of Labor's actions on two grounds. First, § 5333(b) is unconstitutional because it violates the requirement that Spending Clause conditions be "unambiguous." *West Virginia*, 59 F.4th at 1141 (quoting *South Dakota v. Dole*, 483 U.S. 203, 207–11 (1987)). Second, if the Court finds § 5333(b) unambiguous enough to be constitutional, it must apply a "clear-statement rule" and reject the Department of Labor's broad interpretation of § 5333(b), *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 815–16 (11th Cir. 2022) (en banc), which would allow Florida entities to receive federal funding without a waiver of SB 256's requirements.

**A.   Section 5333(b) violates the Spending Clause.**

The Spending Clause authorizes Congress to "lay and collect Taxes" and "to pay the Debts and provide for the common Defence and general Welfare of the United

States." U.S. Const. art. I, § 8, cl. 1. Congress may place conditions on funding to the States, subject to certain limits. *West Virginia*, 59 F.4th at 1140–41. Relevant here, "Congress must speak 'unambiguously' and 'with a clear voice' when it imposes conditions on federal funds." *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). Failure to do so "render[s] a spending restriction facially unconstitutional." *Id.* at 1142.

Section 5333(b) requires Florida entities to agree to "arrangements the Secretary of Labor concludes are fair and equitable," 49 U.S.C. § 5333(b)(1), which must include "provisions that may be necessary for . . . the continuation of collective bargaining rights," 49 U.S.C. § 5333(b)(2). These requirements are hopelessly ambiguous.

Several courts have expressly reached that conclusion. One court called these requirements "ambigu[ous]," "unclear," and even "intentionally vague." *Amalgamated Transit Union, Int'l*, 2022 WL 17978627, at *38. Another court complained that "there is virtually no guidance" to determine their meaning and even acknowledged that "we know every little . . . what the . . . condition[s] mean[]."*Matter of New Jersey Transit Bus Operations*, 592 A.2d at 559. A third court found the conditions so devoid of content that it invoked a provision of the Administrative Procedure Act (APA) reserved for statutes lacking any "meaningful standard." *See City of Macon v. Marshall*, 439 F. Supp. 1209, 1220 (M.D. Ga. 1977) (invoking 5 U.S.C. § 701(a)(2) to bar APA review); *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019) (explaining that § 701(a)(2) applies only when a statute leaves the agency's discretion "unbounded" and there is "no meaningful standard" to apply).

10

These courts were plainly correct in concluding that § 5333(b) is ambiguous. To start, the phrase "fair and equitable" lacks any discernible standard. In fact, it appears that Congress included this language because it wished to authorize "the exercise of judgment" by the Secretary. *Amalgamated Transit Union Int'l*, 2022 WL 17978627, at *21 (quotations omitted). In prior litigation, the Department of Labor argued to the D.C. Circuit that the "fair and equitable" language "confers upon [the Secretary] such broad discretion that courts are simply without law to apply in reviewing his decisions" and that § 5333(b) "set[s] forth no precise formulation for determining when labor protective agreements are fair and equitable." *Amalgamated Transit Union Int'l v. Donovan*, 767 F.2d 939, 944 (D.C. Cir. 1985).

Under Eleventh Circuit precedent, that concession condemns the statute to the constitutional trash heap. To comply with the Spending Clause, there must be "an ascertainable condition in the statute" itself. *West Virginia*, 59 F.4th at 1148. "The Constitution does not allow the Secretary to [supply missing] content," *id.*, because "[t]he Constitution gives Congress, not the executive branch, the power to tax and spend," *id.* at 1147. Put differently, Congress's attempt to delegate to the Secretary of Labor the power to provide the constitutionally required clarity violates clear Eleventh Circuit precedent.

The phrase "may be necessary for . . . the continuation of collective bargaining rights" fares no better. *See Amalgamated Transit Union Int'l*, 2022 WL 17978627, at *21 (finding this phrase ambiguous). For example, "continuation" can mean either not ending or not diminishing. *See California v. Dep't of Labor*, No. 2:13-cv-02069, 2016 WL

11

4441221, at *10 (E.D. Cal. Aug. 22, 2016). Thus, "[b]y using the word 'continuation' . . . Congress could have meant [only] to prevent the *end* of collective bargaining," or it "could also have meant to prevent state and local governments from *chipping away* at . . . collective bargaining rights." *Id.* at *12 (emphasis added).

Similarly, the phrase "collective bargaining rights" lacks clarity. The statute does not define "collective bargaining rights," *Amalgamated Transit Union, Int'l*, 2022 WL 17978627, at *14, and the term "collective bargaining" is susceptible to multiple interpretations, *see Donovan*, 767 F.2d at 949–50 (noting that "Congress used the phrase generically" and "made it clear that federal labor policy would dictate [its] substantive meaning"); *id.* at 957 (MacKinnon, J. concurring) (explaining that "[c]ollective bargaining is not a precise term"). Further, "rights" might "refer to the many actions employees can undertake to assert and protect their interests," or it might refer only to a narrower set of rights, such as "the rights to an employer's recognition, to collective negotiation, [or] to seek new members." *Amalgamated Transit Union, Int'l*, 2022 WL 17978627, at *27.

Consider the statute's application in this case. Florida has made incremental reforms to its collective bargaining process via SB 256, including ending the collection of union dues by public employers and making greater efforts to ensure that union membership is voluntary. If "continuation of collective bargaining rights" means that Florida may not end collective bargaining, then Florida's law certainly does not violate § 5333(b). If, on the other hand, the statute prevents the State from in any way

diminishing any right that touches on collective bargaining, that question is far more difficult to resolve.

Because the statute does not give Florida clear notice of what it must do to avoid losing hundreds of millions in federal funding, it is unconstitutional. The Eleventh Circuit's decision in *West Virginia* is instructive. There, a funding condition prevented the States from using federal funds to "'directly or indirectly offset a reduction in the[ir] net tax revenue' caused by a tax cut." *West Virginia*, 59 F.4th 1143. In finding this provision unconstitutional under the Spending Clause, the court asked "whether a state policymaker can understand and comply with the statute." *Id.* at 1144. For the reasons stated above, § 5333(b) fails that test.[2]

As the cases discussed above illustrate, courts have labored painstakingly to understand Congress's meaning in § 5333(b). The Supreme Court of New Jersey even lamented that "[t]here is virtually no guidance from the case law, legislative history, or documented action by the [Department] to aid in determining precisely at what point conflicts between state law and [§ 5333(b)] will result in the [Department's] discretionary or mandatory decertification and defunding of a state transit system." *Matter of New Jersey Transit Bus Operations*, 592 A.2d at 559.

---

[2] The problem is illustrated by the Department of Labor's long running dispute with the State of California over the State's Public Employee Pension Reform Act. The Department has *twice* changed positions, with the Obama Administration finding California's statute inconsistent with § 5333(b), the Trump Administration abandoning that position, and the Biden Administration reasserting that position. *See* Steven Malanga, *Undermining Pension Reform*, City J. (Nov. 23, 2021), https://www.city-journal.org/article/undermining-pension-reform. The Trump Department of Labor even admitted that the statute is "ambigu[ous]" as part of explaining its change in position. *See* Doc. 1-1 at 6, *Amalgamated Transit Union, Int'l v. Dep't of Labor*, No. 2:20-cv-953 (E.D. Cal. Aug. 22, 2019).

Unfortunately, in none of these cases did a plaintiff raise the argument that the statute's ambiguity renders it unconstitutional under the Spending Clause, which would have saved significant judicial resources and punted the question back to Congress where it belongs.

**B.      The Department of Labor's Actions Violate the APA.**

If the Court finds that § 5333(b) is not so ambiguous as to be unconstitutional, the statute is at a minimum susceptible to multiple interpretations. As such, the Spending Clause's "clear-statement rule" would require the Court to resolve any ambiguity in Florida's favor. *See Adams*, 57 F.4th at 815–16. Stated differently, Florida should only be required to waive the requirements of SB 256 if § 5333(b) "unambiguously mean[s]" what the Department of Labor says it means. *Id.* at 816. Because the Department of Labor cannot show that § 5333(b) unambiguously conflicts with SB 256, the Department's written decisions demanding that PERC issue waivers are contrary to law under the APA.

As explained, "[c]ontinuation" can mean either not ending or not diminishing. *California*, 2016 WL 4441221, at *10. And "Congress could have meant to prevent the end of collective bargaining" or it "could have meant to prevent state and local governments from chipping away at . . . collective bargaining rights." *Id.* at *12. Similarly, "rights" might "refer to the many actions employees can undertake to assert and protect their interests," or it might refer only to specific rights, such as "the rights to an employer's recognition, to collective negotiation, [or] to seek new members." *Amalgamated Transit Union, Int'l*, 2022 WL 17978627, at *27.

14

The relevant provisions of SB 256 certainly do not *end* collective bargaining, and Florida therefore prevails under the clear statement rule. *See Adams*, 57 F.4th at 815–16. Tellingly, the Department of Labor's letters identify no case holding that reforms like Florida's are inconsistent with § 5333(b). *See* Doc. 1-3 at 5.

Moreover, SB 256 does not even *diminish* collective bargaining rights. As discussed, § 5333(b)(2)(B) does not clearly indicate which "rights" it protects. The statute is clear, however, that it only protects "the interests of *employees*." 49 U.S.C. § 5333(b)(1) (emphasis added). SB 256 imposes at most only de minimis burdens on employees. *See* § 447.301(1)(b), Fla. Stat. (requiring employees to sign a membership authorization form); § 447.303(1), Fla. Stat. (requiring employees to make payments directly to the union); § 447.305(6), Fla. Stat. (imposing no duties on *employees* but requiring *unions* lacking evidence of broad employee support to seek recertification). And it arguably *enhances* employee collective bargaining rights by ensuring union participation is truly voluntary. *See Felter v. S. Pac. Co.*, 359 U.S. 326, 332, 334 (1959) (explaining that a statute allowing an employee "to decide for himself whether to submit to [dues deduction], and whether to revoke an authorization after the expiration of one year," promoted the "employee's freedom of decision").

Because § 5333(b) does not unambiguously prevent Florida from implementing SB 256's reforms, the Department of Labor's actions are contrary to law under the APA.

## II.    Florida Will Suffer Irreparable Harm Absent Preliminary Relief.

The people of Florida enacted SB 256 through their duly elected representatives. The challenged actions force the State to choose between losing hundreds of millions in federal funding or abandoning the will of the people. Either outcome inflicts irreparable harm on the State.

"[A] state's 'inability to enforce [its] duly enacted plans clearly inflicts irreparable harm on the State'" *Nelson*, 576 F. Supp. 3d at 1039 (quoting *Abbott*, 138 S. Ct. at 2324 n.17). Similarly, when "sovereign immunity bars the recovery of monetary damages from the federal government," the State's "financial injury . . . becomes irreparable." *Florida v. Becerra*, 544 F. Supp. 3d 1241, 1300 (M.D. Fla. 2021).

Put simply, whether the State loses money or, as has occurred thus far, is forced to waive the applicability of its duly enacted laws, either outcome qualifies as irreparable harm.

## III.    The Balance of Equities and Public Interest Favor Preliminary Injunctive Relief.

The equities and the public interest merge for federal government action. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Both favor an injunction here. "Forcing federal agencies to comply with the law is undoubtedly in the public interest." *Cent. United Life, Inc. v. Burwell*, 128 F. Supp. 3d 321, 330 (D.D.C. 2015). And it is in the public interest to protect critical funding for public transportation and to protect the will of the people enacted through their elected representatives. *Cf.* U.S. Const. art. IV, § 4 (requiring the United States to "guarantee to every State in this Union a Republican

Form of Government"). Finally, SB 256 protects rights under both the Florida Constitution and the U.S. Constitution. *See* Art. I, § 6, Fla. Const. (providing that "[t]he right of persons to work shall not be denied or abridged on account of membership or non-membership in any labor union or labor organization"); *Janus*, 138 S. Ct. at 2459–60 (explaining that "forc[ing]" nonmembers to "subsidize a union . . . violates the free speech rights of nonmembers"). Protecting constitutional rights is certainly in the public interest.

## IV.    No Bond is Required Under Rule 65.

"[T]he amount of security . . . is a matter within the discretion of the trial court." *BellSouth Telecomm. v. MCIMetro Access Transmission Servs.*, 425 F.3d 964, 971 (11th Cir. 2005) (quotations omitted). And in cases where a State sues the federal government seeking an injunction, courts routinely require no bond. *E.g.*, *Texas v. United States*, 524 F. Supp. 3d 598, 668 (S.D. Tex. 2021); *Nelson*, 576 F. Supp. 3d at 1040; *Becerra*, 544 F. Supp. 3d at 1305.

## CONCLUSION

For the foregoing reasons, the Court should preliminarily enjoin Defendants from enforcing the requirements in 49 U.S.C. § 5333(b) against Florida entities. In the alternative, the Court should order Defendants to provide the funding without the requirement that PERC waive the requirements of SB 256 for the life of the federally funded projects.

17

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

*/s/ James H. Percival*
James H. Percival (FBN 1016188)
CHIEF OF STAFF

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

Natalie P. Christmas (FBN 1019180)
COUNSELOR TO THE ATTORNEY GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

18

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 10, 2023, a true and correct copy of the foregoing, including exhibits, was electronically filed and subsequently furnished by U.S. Mail to the following Defendants, who have not yet appeared:

Pete Buttigieg
Secretary of the Department of Transportation
U.S. Department of Transportation
1200 New Jersey Ave., SE
Washington, DC 20590

U.S. Department of Transportation
1200 New Jersey Ave., SE
Washington, DC 20590

Julie A. Su
Acting Secretary of the Department of Labor
U.S. Department of Labor
200 Constitution Ave., NW
Washington, DC 20210

U.S. Department of Labor
200 Constitution Ave., NW
Washington, DC 20210

Karen Torre
Chief of the Division of Interpretation and Regulations
U.S. Department of Labor
200 Constitution Ave., NW
Washington, DC 20210

Nuria Fernandez
Administrator of the Federal Transit Administration
Federal Transit Administration
1200 New Jersey Ave., SE
Washington, DC 20590

Yvette G. Taylor
Regional Administrator of the Federal Transit Administration
Federal Transit Administration
1200 New Jersey Ave., SE
Washington, DC 20590

Federal Transit Administration
1200 New Jersey Ave., SE
Washington, DC 20590

United States of America
c/o United States Attorney's Office
Southern District of Florida
299 East Broward Blvd. # 108
Fort Lauderdale, FL 33301

U.S. Department of Justice
Justice Management Division
950 Pennsylvania Ave., NW
Room 1111
Washington, DC 20530

*/s/ James H. Percival*
James H. Percival